# EXHIBIT J

# HERTEN, BURSTEIN, SHERIDAN, CEVASCO, BOTTINELLI, LITT, TOSKOS & HARZ, L.L.C.

THOMAS J. HERTEN ▲
ALBERT BURSTEIN
PHILIP F. SHERIDAN, JR.
ANDREW J. CEVASCO
TERRY PAUL BOTTINELLI *○
ARNOLD D. LITT ▲**
MENELAOS W. TOSKOS
STEVEN B. HARZ ▲

FRANCIS B. RUSCH
(1956-1995)

**COUNSELLORS AT LAW**

COURT PLAZA NORTH

25 MAIN STREET

HACKENSACK, NEW JERSEY 07601-7032

(201) 342-6000

TELECOPIER

(201) 342-6611

SUSAN M. MARRA ▲
PATRICK PAPALIA *▲

THOMAS S. McGUIRE
LOUIS C. TOMASELLA ▲
JODI L. CAMPBELL ▲
JODI S. BRODSKY ▲
ANGELO BAGNARA
NILUFER O. DeSCHERER ▲*
LISAANNE R. BICOCCHI ▲
CRAIG P. BOSSONG †

JASON T. SHAFRON ▲†○
SCOTT D. JACOBSON
COUNSEL TO THE FIRM

June 25, 2004

<u>VIA HAND DELIVERY</u>
Louisa Pesce, Investigator
State of New York
Executive Department
Division of Human Rights
175 Fulton Avenue, Room 211
Hempstead, New York 11550

Re:    Arleigh Spencer v. International Shoppes, Inc.
        SDHR No: 2-E-ORS-04-3508039-A
        EEOC Charge No: 16GA404217

## STATEMENT OF POSITION

International Shoppes, Inc. (hereinafter referred to as "International Shoppes," the "Company" or "Respondent"), by its attorneys, Herten, Burstein, Sheridan, Cevasco, Bottinelli, Litt, Toskos, & Harz, L.L.C., submits this statement in support of its position in the above referenced matter. Complainant, Arleigh Spencer (hereinafter referred to as "Complainant" or "Spencer") was hired as a payroll clerk by Respondent, International Shoppes, on September 27, 1999. Spencer's job functions included, but were not limited to, receiving time cards from all International Shoppes' employees, processing employees' time cards for ADP for payroll, and distributing all employees' paychecks except for the executive officers' paychecks.

Spencer was discharged on June 1, 2004 for misconduct which involved Spencer's violations of long standing practices and policies of the Company and Spencer's actions which constitute a violation of law. Throughout his employment by International Shoppes, Spencer had been disciplined numerous times for violation of Company policies. Moreover, despite the Last Chance Opportunity given to Spencer on April 27, 2004, he continued to violate Company polices and engage in misconduct.

1

Also Member of CA Bar
Also Member of PA Bar
▲ Also Member of NY Bar
† Also Member of TX Bar
† Also Member of DC Bar

* Also Member of FL Bar
+ Also Member of US Patent Bar
○ New Jersey Supreme Court Certified Civil Trial Attorney

Contrary to Spencer's allegations and misrepresentations in his Charge of Discrimination filed in this matter (the "Charge"), International Shoppes does not have a policy of providing all employees with annual wage increases. Therefore, Spencer's allegations that he was entitled to a salary increase in both 2003 and 2004 are untrue. During the hiring process, Spencer was advised of this policy at his initial interview by Connie Petrucci, Director of Human Resources, and Annette Balu, Head Bookkeeper (See the Affidavit of Concetta "Connie" Petrucci attached hereto as Exhibit A). Spencer was the sole payroll clerk for International Shoppes. As the payroll clerk, he was fully aware of all employees' salaries (except the executive salaries which were processed by Ed Morales) and, therefore, personally aware that all employees did not receive annual salary increases (See Exhibit A), (See the Affidavit of Egbert "Ed" Morales attached hereto as Exhibit B), and (See the Affidavit of Annette Balu attached hereto as Exhibit C). In addition, Michael Halpern, President, repeatedly reminded Spencer that the Company did not give annual salary increases. Notwithstanding this, Spencer continuously hounded management for wage increases. As a result, Spencer received salary increases in 2000, 2001 and 2002, although most employees did not receive raises in all of those years (See Exhibits A, B and C). Even though Spencer was given the above raises, Spencer frequently complained to Connie Petrucci that he felt additional salary increases were warranted for him (See Exhibit A). Ms. Petrucci reminded Spencer that the Company did not have a policy of giving employees annual salary increases and that employees in Ms. Petrucci's operation had not received a salary increase in a number of years (See Exhibit A). As such, contrary to Spencer's false representations in his Charge, Spencer was fully aware that International Shoppes did not have a policy of giving annual salary increases, that employees went several years without a salary increases, and that his not receiving salary increases in 2003 and 2004 had nothing to do with any discrimination (See Exhibits A, B and C).

In August 2002, another occasion when Spencer hounded management for a wage increase, Spencer went to Connie Petrucci and requested an additional salary increase over and above the increase Spencer had already been given (See Exhibit A). Ms. Petrucci explained to Spencer, as she had done in his initial interview and numerous times throughout his employment, that International Shoppes did not even have a policy of giving annual increases, let alone additional wage increases over and above those already given (See Exhibit A). Ms. Petrucci advised Spencer that because of the Company policy with respect to salary increases, if Spencer wanted any additional increases, Spencer would have to speak directly with Michael Halpern. Mr. Halpern advised Spencer that the Company felt that Spencer was being paid the maximum amount that should be paid for the position of payroll clerk and that no further increases were warranted for the position.

Only at that point, after Spencer was denied the additional salary increase in August 2002, did Spencer advise Mr. Halpern that a phantom employee was being paid by the Company (payroll fraud). Spencer attempted to use that matter to blackmail the Company into giving him an additional salary increase (See Exhibit A). Spencer then left Mr. Halpern's office and began screaming and yelling at Mr. Halpern in front of all of the office employees (See Exhibit C). After screaming and yelling, Spencer yelled to Mr. Halpern, "then why don't you fire me!" (See Exhibit C). In other instances, Spencer yelled at Michael Halpern "I should have sued your ass!" and Spencer called Mr. Halpern an "asshole!" Annette Balu and certain other employees

2

witnessed these outbursts by Spencer (See Exhibits C).  In a confrontation Spencer had with his direct supervisor, Ed Morales, regarding an incident in which Spencer called out sick but did not follow Company policy by calling in to Annette Balu, Head Bookkeeper, Spencer yelled at Mr. Morales and called him a "coward!" (See Exhibit B).

After Spencer brought to the attention of the Company that a phantom employee had been receiving paychecks from International Shoppes for a period of time (the payroll fraud), the Company conducted an investigation.  As a result of the investigation, the Company determined that Spencer, himself, had been aware for a substantial period of time that this phantom employee was not performing services on behalf of International Shoppes (payroll fraud) but yet was being paid by the Company since the early part of 2001.  Spencer knew about the phantom employee from his position of being the sole Company payroll clerk.  Even though he knew that this phantom employee was not performing any services for the Company, he continued to process a paycheck for this employee for several months.  As a result of the above, on September 17, 2002, Spencer was given a Disciplinary Notice and Second Warning regarding his direct violation of Company policy (A true and accurate copy of the Disciplinary Notice and Second Warning, dated September 17, 2002, is attached hereto as Exhibit D).  As such, contrary to Spencer's allegations in his Charge, his being disciplined with respect to the phantom employee matter had nothing to do with discrimination but only to do with Spencer's own improper actions.

In everyday conversation between Spencer and Annette Balu, Spencer made a point of advising Ms. Balu that he was suing his previous employer for wrongful termination (See Exhibit C).  He also implied to Ms. Balu that he had had previous lawsuits prior to the one he was pursuing at that time (See Exhibit C).  In addition, during the initial interview Spencer made a point of advising Connie Petrucci that Spencer was suing his previous employer because Spencer believed he had been terminated for doing certain things in his job that the previous employer did not want him to do (See Exhibits A and C).  Finally, Ed Morales believed that Spencer was "following a book on how to get fired and bring a lawsuit against the Company" by the way Spencer grossly manipulated situations to make it appear as if the Company was treating him unfairly (See Exhibit B).

On September 25, 2003, Spencer received a Memorandum from the Company regarding payroll accounting irregularities discovered by the Company.  After an investigation by the Company in August and September 2003, the Company determined that certain bookkeeping and accounting irregularities were taking place with respect to the Company payroll in general and Spencer's management of his own paycheck.  First, the Company determined that Spencer was not withholding the proper amount of taxes from employees' paychecks consistent with each employee's W-4 Form.  Spencer also was not making the proper tax withholdings on his own personal paycheck as well as bonus payments and the compensation received in lieu of participating in the Company's medical plan.  Second, the Company determined that Spencer was not making proper payments to the loan he took out from the 401(k) account.  Spencer was not authorized to block these deductions or vary the amount of these deductions.  In addition, Spencer took several unauthorized salary advances.  Finally, Spencer was not deducting the proper garnishment amounts from certain paychecks.  After these irregularities were discovered,

3

Spencer was advised that the Company would now monitor all payroll documents with respect to irregularities (A true and accurate copy of the September 25, 2003 Memorandum is attached hereto as Exhibit E). At that time, Mr. Morales believed that Spencer should be fired (See Exhibit B). In its continuing effort to try to work with Spencer and turn around his behavior, the Company, however, decided to give Spencer another chance.

In response to the September 25, 2003 Memorandum, Spencer made allegations that Michael Halpern and the Company were improperly harassing him and creating a hostile working environment. As a result of Spencer's allegations, the Company promptly conducted an investigation and requested that Spencer cooperate and answer questions during the investigation (See Exhibit A). Spencer refused to cooperate with the investigation in any fashion (See Exhibit A). For example, when Spencer was asked during the investigation, "Why do you believe you have been discriminated against on the basis of your race?" Spencer responded, "No Comment." Spencer was asked, "Were there particular statements made? What was the statement? When made? By whom? Were there any witnesses to this event?" Spencer responded to all of those questions, "No Comment." Spencer was further asked, "Why do you believe you have been discriminated against on the basis of your age?" Spencer again responded, "No Comment." For each and every question asked by the Company during the investigation, Spencer would respond, "No Comment" or "My attorney tells me not to respond." International Shoppes exercised reasonable care to prevent harassment by way of its proper complaint procedure and investigation procedure regarding any alleged harassing behavior. As the above indicates, Spencer, however, unreasonably failed to take advantage of any preventive or corrective opportunities provided by the Company. As such, based upon Spencer's refusal to cooperate with the investigation, the Company was forced to terminate its investigation.

Spencer signed a Loan Agreement Between International Shoppes, Inc. and Arleigh Spencer, dated January 6, 2003, which provided for a loan to Spencer and deduction of $125.00 from his paychecks until the entire loan amount ($1,103.72 plus 6% accrued interest) was paid (A true and accurate copy of the Loan Agreement Between International Shoppes, Inc. and Arleigh Spencer, dated January 6, 2003, and all prior Loan Agreements Between International Shoppes, Inc. and Arleigh Spencer are attached hereto as Exhibit F). However, as sole payroll clerk in charge of all deductions, Spencer without authorization and without telling anyone in Company management intentionally set up the loan repayment schedule to improperly stop deductions from his paycheck for amounts owed as interest after the principal amount of the loan was repaid (See Exhibits B and C). As a result of Spencer's dishonesty and violation of Company policy, on April 13, 2004, the Company advised Spencer that he was being suspended for three (3) days without pay for his violations of Company policies (See Exhibit B). Spencer also was advised that the payroll function, including the determination of all deductions, with respect to his individual wages would be performed by Spencer's supervisor, Ed Morales (See Exhibit B). In addition, Spencer was advised that he must follow all Company directives relating to all payroll matters including payroll deductions.

On April 27, 2004, the Company met with Arleigh Spencer and reminded Spencer that there had been several discussions with him relating to Spencer's policy violations and misconduct (See Exhibit B). The Company also told Spencer at that time that those policy

4

violations and misconduct subjected him to immediate discharge. The Company added that the Company did not want to rehash in that meeting what occurred with Spencer in the past and that the Company was willing to provide Spencer with one Last Chance Opportunity to save his employment. Spencer was told that if he returned to work, he would have to perform his job functions consistent with all policies and directives. The Company told Spencer that any violation of his Last Chance Opportunity would be grounds for immediate discharge (See Exhibit B). Lastly, the Company advised Spencer that the Company was hoping that Spencer would use that opportunity to perform his functions positively and get his employment "back on the right track."

On May 27, 2004, Spencer violated his Last Chance Opportunity by intentionally and unlawfully holding up other employees' paychecks that were to be distributed to the Company's employees in its stores and warehouse (See Exhibit B). The Company advised Spencer that intentionally holding up employees' paychecks not only violates the long standing Company practice with respect to the preparation and distribution of employees' paychecks but also constitutes a crime under the New York State Labor Code (See Exhibit B). The Company asked Spencer why he held up the other employees' paychecks and Spencer's response was that he intentionally held up distributing the paychecks because he thought he was not going to get his paycheck the same day (in fact, Spencer did get his paycheck around 2 p.m. on that day) (See Exhibit B). Although Spencer has the responsibility for payroll, Spencer's paycheck has to be prepared by his supervisor as a result of Spencer's prior improper actions relating to deductions from his paycheck as mentioned above (See Exhibit B). Astoundingly, after Spencer was told on May 28, 2004 of his wrongful actions, he walked off the premises without authorization (See Exhibit B). As a result, Spencer forced the Company to terminate his employment on June 1, 2004.

The above presents a long pattern by an employee who had no regard for Company policy and, at the end, no regard for his coworkers or the law. The Company gave him several warnings, and a Last Chance Opportunity to perform positively. As indicated by his actions, however, Spencer had no desire to perform his job functions on an acceptable level forcing the Company to terminate his employment.

\*                                        \*                                        \*

In light of the foregoing, International Shoppes trusts that the Charge of Discrimination filed in this matter by Mr. Spencer will be dismissed. In the meantime, if you have any questions or require additional information, please do not hesitate to contact me.

Very truly yours,

Steven B. Harz

SBH:ls
Enclosures

5

STATE OF NEW YORK:  EXECUTIVE DEPARTMENT
STATE DIVISION OF HUMAN RIGHTS

ARLEIGH SPENCER,

                COMPLAINANT,

v.

INTERNATIONAL SHOPPES, INC.,

                RESPONDENT

SDHR NO. 2-E-ORS-04-3508039-A
EEOC CHARGE NO. 16GA404217

AFFIDAVIT OF
CONCETTA PETRUCCI

I, Concetta Petrucci, hereby certify and say:

1.　　I am employed by Respondent, International Shoppes, Inc., in the position of Director of Human Resources.  I am a forty-two (42) year old female.  I have worked for International Shoppes for approximately five (5) years.  I have personal knowledge of the facts herein.

2.　　I interviewed Arleigh Spencer, for the position of payroll clerk.  I interviewed Mr. Spencer with Annette Balu, Head Bookkeeper.  At the interview, I advised Mr. Spencer, among other things, that there was no policy at International Shoppes that guaranteed employees any annual review or annual pay increase.

3.　　During his interview, Arleigh Spencer asked if there was growth potential in the position of payroll clerk.  I advised Arleigh that yes, there was the potential for growth, but that International Shoppes does not have a policy of annual salary increases.  Arleigh understood this before he accepted his employment by International Shoppes.

4.　　During his employment interview, Arleigh also advised me that he was suing his former employer for wrongful termination.

5.      In his position as sole payroll clerk, Arleigh was responsible for the processing of all employee paychecks, except the executive salaries, for the International Shoppes and its related companies. The companies have operations in Washington, D.C., Maryland, Virginia, Pennsylvania and New York. Arleigh would get time cards for each employee, enter the information into the ADP system, process the checks once received from ADP and send the paychecks to all stores for every employee on the Thursday morning ending each pay period. Arleigh Spencer was not responsible for Executive employee paychecks. Those paychecks were processed by Ed Morales, Mr. Spencer's supervisor.

6.      Richard Dombrowski, Arleigh's prior supervisor, and Annette Balu, Head Bookkeeper, advised me that Arleigh Spencer would come and go as he pleased and that Arleigh would leave work whenever he wished. Mr. Dombrowski and Ms. Balu further advised me that although Arleigh docked other employees for missed time, Arleigh never docked his own paycheck for the numerous times he came in to work late or left the office early for personal reasons.

7.      Arleigh Spencer would call me constantly to complain about his employment by International Shoppes. Arleigh alleged that Michael Halpern was treating him poorly including, after each time a request by Arleigh for a salary increase which was denied by Michael Halpern. I would occasionally remind Arleigh that although he may have felt that he deserved a salary increase, International Shoppes did not give annual salary increases and he, like all other employees, would have to wait until the Company determined that a salary increase was proper. The employees in my operation as Director of Human Resources have not received raises in a number of years.

8.    I believe that Arleigh Spencer would manipulate instances with Michael Halpern to make it appear that Michael Halpern was targeting Arleigh. If, for example, Arleigh's request for a raise was denied, he would verbalize his discontent to other employees throughout the Company.

9.    Michael Halpern brought an incident to my attention regarding a phantom employee being paid by the Company. Mr. Halpern advised me that Arleigh Spencer advised the company of the "fraud in the company" only after Michael Halpern had denied Arleigh's request for a salary increase. Mr. Halpern further advised me that he believe that Arleigh would not have disclosed this information to the Company if he had been given a salary increase. Michael Halpern advised me that Arleigh used this information of a phantom employee as a way to blackmail the Company.

10.    September 11, 2001 had a major negative effect on the business of International Shoppes. Following September 11, 2001, International Shoppes reduced the benefits received by all the employees in the office and warehouse. Because of this reduction, instead of receiving seven (7) sick days and three (3) personal days, all employees now received five (5) personal/sick days in total. All of the employees in the office and warehouse received this reduction.

11.    Arleigh Spencer was never treated unfairly by International Shoppes. If anything, at times, International Shoppes treated Mr. Spencer more favorably because Mr. Spencer was an unhappy employee and made many other employees uncomfortable by always complaining.

12.    As a result of a complaint Arleigh Spencer made against the Company, the Company conducted a prompt, and thorough investigation.  However, Arleigh Spencer refused to cooperate with the investigation conducted by International Shoppes.

13.    All of the employees in Arleigh Spencer's department are approximately the same age.

_____

CONCETTA PETRUCCI

Sworn to and subscribed to before me this 21 day of June, 2004.

Rachelle L. Harz
Notary Public, State of New York
No. 02HA4698746
Qualified in New York County
Commission Expires Sept. 30, 20 05

STATE OF NEW YORK: EXECUTIVE DEPARTMENT
STATE DIVISION OF HUMAN RIGHTS

---

ARLEIGH SPENCER,

COMPLAINANT,

v.

INTERNATIONAL SHOPPES, INC.,

RESPONDENT

SDHR NO. 2-E-ORS-04-3508039-A
EEOC CHARGE NO. 16GA404217

**AFFIDAVIT OF
EGBERT MORALES**

---

I, Egbert Morales, hereby certify and say:

1.    I am employed by Respondent, International Shoppes, Inc., in the position of Controller.   I am a sixty-four (64) year old Hispanic male.   I have worked for International Shoppes for the past sixteen (16) years.  I have personal knowledge of the facts herein.

2.    As Controller, I was Arleigh Spencer's direct supervisor in his position as payroll clerk.  Mr. Spencer knew that due to the type of business International Shoppes was involved in, employees went years without receiving salary increases.  I believe that most employees of International Shoppes had not received a raise in the past two years and prior to that, none since 1999.

3.    After the negative effect of September 11, 2001 had on the Company, International Shoppes reduced the benefits received by all the employees in the office and warehouse.  Because of this reduction, instead of receiving seven (7) sick days and three (3) personal days, all employees now received five (5) personal/sick days in total.  All of the employees in the office and warehouse received this reduction.

140

141

4.     Arleigh Spencer was never treated any differently than any other employee. Arleigh, if anything, received preferable treatment by the Company. Arleigh Spencer was a belligerent, unhappy person who broadcasted his unhappiness to any employee who would listen. Arleigh Spencer's comments and actions made other employees uncomfortable. Arleigh Spencer, in fact, received salary increases in 2000, 2001 and 2002, although most employees did not receive any raises in those years.

5.     In a confrontation I had with Arleigh regarding an incident in which Arleigh called out sick but did not follow Company policy by calling in to Annette Balu, Head Bookkeeper, Arleigh yelled at me and called me a "coward!"

6.     In September 2003, the Company conducted an investigation regarding numerous payroll irregularities. The investigation disclosed that Arleigh Spencer had improperly adjusted garnishment withholdings and changed the tax withholdings with respect to his paychecks. I believe that Arleigh Spencer should have been fired at that time because of this but the Company decided to give Arleigh Spencer another chance.

7.     On April 13, 2004, I spoke with Arleigh Spencer regarding his improper actions with respect to deductions from his paycheck regarding a loan he took out from International Shoppes. Arleigh Spencer admitted to me that he intentionally without permission decided to stop making payments from his paycheck upon the balance of the principal amount of the loan being paid. Arleigh Spencer was fully aware that the terms of the Loan Agreements he signed with the Company contained a 6% accrued interest payment upon the principal and signed Agreements to that effect. Arleigh Spencer told me that he did not care about the Agreements he signed and that he refused to pay interest on the loan so he changed the payment structure without permission. As such, I advised

2

Arleigh Spencer that he was suspended for three (3) days without pay for violation of Company policies.

8.      I am in charge of processing all executive salaries for the Company. As a result of Arleigh Spencer's improper actions mentioned above regarding his own paycheck, I began processing Arleigh Spencer's paycheck as well following our April 13, 2004 meeting.

9.      Following the above, the Company gave Arleigh Spencer his Last Chance Opportunity to turn around his employment. I was present with Stephen Greenbaum, Chief Executive Officer, and discussed the Last Chance Opportunity with Arleigh Spencer. Arleigh Spencer completely understood its meaning and consequences.

10.     On May 26, 2004, I spoke with Arleigh Spencer in my office and reminded him that he must give Anthony Petrucci (one of the owners of the Company) the paychecks for the store and warehouse personnel on Thursdays as soon as he was done processing them, as has been the Company policy for several years, and that after 3:00 p.m. on Thursdays it would be okay to distribute the paychecks to the inventory and office employees. I also assured Arleigh Spencer that I would give him his paycheck, which I prepared by hand, also on Thursdays. Arleigh Spencer left my office without comment and at this time I believed the matter was taken care of and Arleigh Spencer had fully understood what I said.

11.     On May 27, 2004, the payroll paychecks came in to the Company and were given to me. I reviewed the payroll and then I gave it to Arleigh Spencer to process in the usual manner and as I had instructed him the day before. At approximately 2:00 p.m. that day, I handed Arleigh Spencer his paycheck. At approximately 2:30 p.m., Anthony Petrucci

telephoned me and advised me that he did not yet receive the paychecks for all of the employees in the stores and warehouse. A few minutes later, Anthony Petrucci and Stephen Greenbaum came to my office and again advised me Anthony Petrucci had not received the paychecks for all of the employees in the stores and warehouse. To say that Anthony Petrucci was angry would be to put it mildly. Anthony Petrucci advised me that Arleigh told Anthony that he (Arleigh) was not going to give Anthony the paychecks. I advised Stephen Greenbaum and Anthony Petrucci that I would speak with Arleigh immediately.

12. Immediately following the above, I spoke with Arleigh and told him in no uncertain terms that he was to give Anthony Petrucci the paychecks for the employees in the stores and warehouse as soon as possible. Anthony Petrucci received the paychecks at 3:00 p.m. At this point I thought that Arleigh had also distributed the office and inventory employees' paychecks.

13. On Friday, May 28, 2004, at approximately 10:00 a.m. in the presence of Stephen Greenbaum, I asked Arleigh why he did not follow Company policy regarding the distribution of the employee paychecks. Arleigh simply stated that he (Arleigh) was not going to give out any of the stores and warehouse employees' paychecks until Arleigh received his own paycheck from me. I reminded Arleigh that I had given him his check at approximately 2:00 p.m. the day before. Arleigh said that that was when he began processing the payroll. I asked Arleigh whether his statements meant that from 10:00 a.m. to 2:00 p.m. he did nothing with the payroll. Arleigh's response was "yes." At that time, Stephen Greenbaum advised Arleigh that failure to pay the employees was a crime in the State of New York.

143

14.    As a result of all of the above, I realized that Arleigh Spencer felt he could hold up everybody else's paychecks because his own paycheck was not in the pile. However, there are one hundred fifteen (115) paychecks that Arleigh was holding up. Arleigh went on to say that once I gave him the payroll package at 10:00 a.m., that his paycheck should have been included. I have been giving Arleigh his paycheck on Friday since the time I began preparing it and not once did he indicate to me that he wanted it earlier nor did he indicate to me that he was unhappy with any procedure regarding his paycheck.

15.    In no way should the payroll processor (Arleigh) think that he could decide what rules to follow and what rules to disregard, nor does Arleigh have the right to punish 115 employees for his own perceived slight against him. In addition, Arleigh does not have the authority to change established Company policies and procedures.

16.    If Arleigh was unhappy with Company policies and procedures, the proper way to handle the situation is to speak to me to see if I could accommodate his concerns. Then, if I did not, he should have spoken to the Human Resources Department or one of my supervisors.

17.    I was advised by Michael Halpern, President, that he observed Arleigh distributing paychecks on Friday, May 28, 2004, to the office and inventory personnel. I had specifically instructed Arleigh to distribute the paychecks on Thursday, May 27, 2004, after 3:00 p.m. Once again, Arleigh disregarded my instructions.

18.    At approximately 11:00 a.m. on May 28, 2004, Arleigh left the Company premises without authorization claiming he was sick.

19.    On Tuesday, June 1, 2004 (the first day back to the office following the Memorial Day weekend holiday), I was present when the Company terminated Arleigh Spencer.

144

We advised Arleigh that he had violated his Last Chance Opportunity and because of his misconduct, he was being terminated from the Company. I believe that Arleigh's termination was warranted based upon his continued violations of Company policies during his employment by International Shoppes.

20. Based upon Arleigh's actions to manipulate situations and intentionally antagonize Company management, I believe that Arleigh was following a book on how to get fired and bring a lawsuit against the Company.

21. All of the employees in our back office (accounting department) are approximately the same age.

_____
EGBERT MORALES

Sworn to and subscribed before me this 24th day of June, 2004.

_____

Rachelle L. Harz
Notary Public, State of New York
No. 02HA4698746
Qualified in New York County
Commission Expires Sept. 30, 20 05

6

145

STATE OF NEW YORK:  EXECUTIVE DEPARTMENT
STATE DIVISION OF HUMAN RIGHTS

|  |  |
|---|---|
| ARLEIGH SPENCER,<br><br>                    COMPLAINANT,<br><br>v.<br><br>INTERNATIONAL SHOPPES, INC.,<br><br>                    RESPONDENT | SDHR NO. 2-E-ORS-04-3508039-A<br>EEOC CHARGE NO. 16GA404217<br><br><br>AFFIDAVIT OF<br>ANNETTE BALU |

I, Annette Balu, hereby certify and say:

1.      I am employed by Respondent, International Shoppes, Inc., in the position of Head Bookkeeper.  I am a fifty-four (54) year old female.  I have worked for International Shoppes for the past nineteen (19) years.  I have personal knowledge of the facts herein.

2.      My job functions in the position of Head Bookkeeper include, but are not limited to, being in charge of accounts receivables, accounts payable, cash flow of the Company and sales.  My job functions are completely separate and distinct from the job functions which were performed by Arleigh Spencer, payroll clerk.  I only performed his job functions when Mr. Spencer was on vacation or out sick during important payroll days, which was approximately four (4) times a year.

3.      I interviewed Arleigh Spencer for the position of payroll clerk, along with Connie Petrucci, Director of Human Resources.  Arleigh Spencer, after he began working on the Company's payroll, soon became aware that due to the type of business International Shoppes was involved in, employees went years without receiving salary increases.  I

have not received a salary increase since August 2002. Before that, I had not received a salary increase since May 2001 and before that since July 1999.

4.    Arleigh was the sole payroll person at International Shoppes. He was aware of all employees' salaries except the executive salaries which were processed by Ed Morales. As such, Arleigh was fully aware that International Shoppes did not have a policy of giving annual salary increases and that most employees went several years without a salary increase.

5.    Following September 11, 2001, International Shoppes reduced the benefits received by all the employees in the office and warehouse. Because of this reduction, instead of receiving seven (7) sick days and three (3) personal days, all employees now received five (5) personal/sick days in total. All of the employees in the office and warehouse received this reduction.

6.    Arleigh Spencer was never treated any differently than any other employee. If anything, International Shoppes treated Mr. Spencer more favorably. For example, the Company gave Easter bonuses one year. Arleigh was mad that he did not receive the same bonus as some employees who had been with the Company for many years (at the time, Arleigh was employed by the Company for less than two (2) years). Following Mr. Spencer's complaints to management, Mr. Spencer received an additional Easter bonus from International Shoppes, even though the Company did not have to give him one. Arleigh Spencer also received compensation from International Shoppes for opting out of the Company insurance program. No other employee in the history of International Shoppes received this compensation.

7.    I shared an office with Arleigh Spencer so I was subjected to his ranting and raving whenever Arleigh fought with management.   Arleigh's behavior negatively affected all of our back office employees' work and he made the other employees extremely uncomfortable.   For example, following a meeting between Arleigh and Michael Halpern wherein Mr. Halpern denied Arleigh's request for a salary increase, Arleigh left Mr. Halpern's office and yelled, "then why don't you fire me!"   In other instances, Arleigh yelled at Michael Halpern "I should have sued your ass!"

8.    Arleigh Spencer also advised me in some of our conversations that he was suing his previous employer for wrongful termination.   He also implied that he had had previous lawsuits prior to the one he was pursuing at that time.

9.    I was aware of several loans that Arleigh Spencer had taken out from the Company.   Arleigh intentionally and improperly tailored the loan repayment to cease after the loan's principal amount was paid even though Arleigh Spencer knew that there was accrued interest on the loan that still had to be paid.

10.    All of the employees in our office (accounting department) are approximately the same age and are all of various national origins and races.

ANNETTE BALU

Sworn to and subscribed before me
this 24th day of June, 2004.

Rachelle L. Harz
Notary Public, State of New York
No. 02HA4698746
Qualified in New York County
Commission Expires Sept. 30, 20 05

3

# EXHIBIT K

**STATE OF NEW YORK: EXECUTIVE DEPARTMENT**
**STATE DIVISION OF HUMAN RIGHTS**
-------------------------------------------------------------------X

**ARLEIGH SPENCER,**

        **Complainant,**

        **-against-**

**International Shoppes, Inc.,**

        **Respondent,**

-------------------------------------------------------------------X

**Verified Reply To**
**Respondent's Answer**
**To Complaint**


**SDHR NO.:**
**2-E-ORS-04-3508039-A**
**Federal Charge No.:**
**16GA404217**

Mr. Arleigh Spencer, the Complainant herein, is represented in the above-captioned proceeding by The Law Offices of Gregory S. Lisi, 55 Front Street, Suite 7, Rockville Centre, New York 11570. Please direct all correspondence to Gregory S. Lisi, Esq.

This constitutes Mr. Spencer's reply to Respondent's answer to Mr. Spencer's original complaint with the State Division of Human Rights, dated May 18, 2004. Since Mr. Spencer's original complaint was filed he has endured continuing discrimination including retaliatory termination in violation of both Title VII of the Civil Rights Act of 1964 as amended 42 U.S.C. §2000e-(3)(a) et seq and Article 15 of the Executive Law of the State of New York (Human Rights Law) §290 et seq.

1.    On or about May 18, 2004 Mr. Spencer filed a complaint with the State Division of Human Rights, annexed hereto as "Exhibit A."

2.    Since that time Mr. Spencer has been terminated in retaliation for that complaint. See

1

105

supplemental Complaint annexed hereto as "Exhibit B."

3. Respondent's Answer, and supplement to its Answer are extremely disingenuous. This is shown right from the first paragraph of the Answer in which Respondent denies knowledge of whether Arleigh Spencer is even a black male. Either Respondent is lying already, or the person who wrote this answer has never even met Mr. Spencer and never spoke to anyone who had any knowledge of Mr. Spencer. Either way, this Answer has very little credibility and should be seen for what it is, a disingenuous attempt to fool this Division and make up pre-textual reasons for their actions.

4. In response to paragraph two of Respondent's verified answer, Mr. Spencer notes that his annual wage increases were and are a matter of record. It is difficult to believe International's portrait of a disgruntled employee "hounding" management for wage increases that the company reluctantly conceded in order to make peace. Mr. Spencer had been getting annual wage increases, and would have no reason to expect that to suddenly change. Mr. Spencer was never told that he was not entitled to the wages increases he received, and would not have any reason to investigate the salaries of other employees with different job responsibilities in order to determine whether or when they received salary increases. He himself received wage increases every year he worked there from the time he started until 2003. Additionally, Mr. Spencer was never told there was a salary cap on his position or a limit to the annual salary increases.

5. Mr. Spencer was told when he was hired that job title was "payroll coordinator." Upon information and belief, Mr. Spencer's job title was always "payroll coordinator," not "payroll clerk" or "payroll processor" as respondent alternatively calls him. Annexed hereto as

2

"Exhibit C" is a memo and job description Mr. Spencer received from respondent describing his position as payroll coordinator, and a page from respondent's own "Exhibit E" from their supplement to their Answer to Mr. Spencer's complaint.

6. The company's allegations that Mr. Spencer failed to disclose fraud in an attempt to blackmail the company is slanderous and further shows the company's retaliatory intent. Such events never happened. Mr. Spencer discovered company fraud involving a phantom employee on August 7, 2002 and immediately (within twenty-four hours) reported it to Michael Halpern, President of International. Mr. Spencer never asked for any additional money or special treatment in exchange for the information he shared. He was merely reporting an irregularity as part of his duties.

7. Additionally, Mr. Spencer was never disciplined or terminated for any "blackmail," the police were never contacted, Mr. Spencer never received any "extra payments or promotions" after August 2002 (in fact the opposite was true) and Mr. Spencer was eventually terminated. Clearly there was no issue of blackmail. Such statements by the company again have very little credibility and should be seen for what it is, a disingenuous attempt to fool this Division. These lies are merely pretext for the real reason for Mr. Spencer's treatment and termination, discrimination and retaliation.

8. Mr. Spencer never sanctioned such a phantom employee, never benefitted from it and reported it as soon as he noticed it.

9. A better question for the company is, who benefitted from getting the phantom paycheck, and who was hurt by its discovery? Not Mr. Spencer, but most likely the people who discriminated and retaliated against him.. Did the company investigate this matter and discipline the guilty parties? Upon information and belief, never. Only Mr. Spencer, a black

3

man in the payroll department who brought the fraud to light, was punished.

10. Mr. Spencer never told his co-workers that he was involved in a lawsuit with a former employer. Management became aware of it when Mr. Spencer's former employer contacted International for information regarding Mr. Spencer's salary, and when Mr. Spencer needed a personal day to make a court appearance. There were no other discussions and Mr. Spencer did not advertise his private situation to his bosses or co-workers. Mr. Morales' widespread and repeated accusation that "Spencer was 'following a book on how to get fired and bring a lawsuit against the Company'" is just another false and malicious accusations designed to harass and malign Mr. Spencer to the point that he would want to quit his job. Instead, Mr. Spencer worked hard to maintain his employment, both by performing his work well and trying to resolve the difficult issues internally within the company and peacefully.

11. International's portrayal of Mr. Spencer's encounter with Mr. Halpern in obscenely distorted. In fact, Mr. Spencer did receive a salary increase in August 2002, but prior to his reporting the phantom employee, as well as compensation for opting out of the company insurance program. It was in August 2003 that Mr. Spencer was denied a salary increase. Mr. Halpern pointed his finger at Mr. Spencer, denied his raise, and yelled at him to get out of the office. This scene was witnessed by other employees resulting in extreme humiliation for Mr. Spencer. Additionally, Ms. Balu, a white female, the bookkeeper whose job description overlaps with some of Mr. Spencer's responsibilities, did receive a salary increase in 2003.

12. The August and September 2003 "investigation" into "irregularities" in payroll accounting resulted in a finding in Mr. Spencer's favor, and he was reinstated at his position. Again, no police investigation was involved, nor was Mr. Spencer demoted or fired. What such

4

investigation did achieve was to help International create false impressions and a hostile atmosphere against Mr. Spencer. Mr. Spencer was further humiliated when, in the course of the investigation, company employees were questioned about these baseless accusations against Mr. Spencer. Many of these employees were not from Mr. Spencer's department, did not work directly with him, and would not have knowledge that could conceivably contribute to the investigation. These inquiries only spread false rumors throughout the company regarding Mr. Spencer, especially since he was finally cleared of all wrongdoing in this investigation. Some of the employees questioned, such as Nikisha Davis-Grullon were uncomfortable and embarrassed at being put in the middle of this situation. See affidavit of Nikisha Davis-Grullon, who has since resigned her position at International, annexed hereto as "Exhibit D."

13. International claims they tried to investigate Mr. Spencer's complaints regarding discriminatory treatment and that he refused to cooperate. In fact, it was Mr. Spencer who approached Ms. Petrucci, the Human Resources Manager, in August 2003 to try to resolve these problems, including the discriminatory treatment by Mr. Halpern. Mr. Spencer attempted to cooperate in the investigation, however, Mr. Spencer was questioned in such a hostile manner, he felt bullied, threatened, and that he was not being treated fairly.

14. All the discipline that Mr. Spencer did receive after August 2002 was merely to try and create a false "paper trail" as a pretext for the real reason for Mr. Spencer's eventual termination; Discrimination and Retaliation.

15. International's accusations that Mr. Spencer altered the loan deductions from his paycheck are malicious and false. Mr. Spencer did not violate company policy or his written loan

5

109

agreement, and he did not change his payroll deduction from his paycheck. Mr. Spencer had several company loans. Payments toward the principal were automatically deducted from his paycheck until the entire principal was paid. At that point the deductions automatically stopped and on April 9, 2004 Mr. Spencer informed Ms. Petrucci that the principal had been paid. On April 12, 2004 Mr. Spencer was informed of the outstanding interest that was due so he could enter the amount into the payroll system and the appropriate deductions toward the interest would automatically be taken. On April 12, 2004 Mr. Spencer requested a reduction in the amount deducted from each paycheck, and Mr. Morales said he would discuss the matter with Mr. Halpern and get back to Mr. Spencer. Although Mr. Spencer took no further action, he was suspended for three days beginning on or about April 14, 2004 based on the company's false accusation that he made his deductions improperly. Mr. Spencer never stopped or reduced any loan repayment deduction from his check.

16. Although Mr. Spencer was never found guilty of any wrongdoing and was always reinstated after a suspension pending an investigation, his pay checks were manually prepared by a supervisor. This excessive supervision, not forced upon any other employee, was designed to further harass, humiliate, discriminate and retaliate against Mr. Spencer.

17. The affidavits of International's employees submitted by International are not probative of the issues at bar. Those employees are still working at International and relying on that company for their salaries and livelihoods. As they are vulnerable to the discrimination and retaliation endured by Mr. Spencer, their endorsements of their employer's allegations are not credible and objective.

6

110

18.     Claimant reserves his right to amend and/or supplement this reply.


Dated: July 22, 2004
        Rockville Center, New York


                                                        ARLEIGH SPENCER
                                                        Complainant


Sworn to before me this 22nd
day of July, 2004



Notary Public


        **Michelle Renée Katz**
    **Notary Public, State of New York**
           **No. 02KA6099031**
        **Qualified in New York County**
  **Commission expires September 22, 2007**

111

**Exhibit A**

STATE OF NEW YORK:  EXECUTIVE DEPARTMENT                EXEC. LAW ART. 15
STATE DIVISION OF HUMAN RIGHTS                                  SDHR NO:
                                                        2-E-ORS-04-3508039-A

```
+-------------------------------------------------------------+
| (State Division of Human Rights on the Complaint of)        |
|                                                             |
| Arleigh Spencer                          COMPLAINANT        |
|                                                             |
|            - against -                                      |
|                                                             |
| International Shoppes, Inc.              RESPONDENT         |
|                                                             |
+-------------------------------------------------------------+
```

TITLE VII/ADEA:   Federal Charge No: 16GA404217

I, Arleigh Spencer, residing at 48 Carolyn Avenue, Valley Stream, NY 11580, Tel. No. (516) 285-4016, (516) - charge the above-named respondent whose address is 540 Rockaway Ave Valley Stream, NY 11581 Tel. No. (516) 872-5797 with an unlawful discriminatory practice relating to Employment in violation of Article 15 of the Executive Law of the State of New York (Human Rights Law) because of Opposing Discrimination, Race and Color, Sex.

Date most recent or continuing discrimination
took place 08/26/03.

        The particulars are:

1.  I am a black male and I opposed unlawful discriminatory practices by my employer.

2.  On September 27, 1999, I was hired by the respondent as a Payroll Coordinator. My job performance has always been exceptional and had always been given favorable wage increases up to August of 2002.

3.  On August 7, 2002, I reported fraud within the company to Michael Halpern(white, male), President. I had discovered that a phantom employee(a person who does not exist) was being paid by the company. Mr. Halpern told me that he would investigate the situation.

4.  On September 17, 2002, I received a memo re: Disciplinary Notice and Second Warning from Mr. Halpern and Steven Greenbaum(white, male), CEO indicating that I had sanctioned the payroll fraud. However, the first warning was concerning a different situation. The phantom employee had already been removed from the payroll in August 2002.

5.  In early August 2003, Concetta Petrucci, Human Resources Director, approached Mr. Halpern about my annual salary increase.

Complaint: Title VII/ADEA (INT.10) (1 of 2)
/det
05/18/04

SDHR NO: 2-E-ORS-04-3508039-A        FEDERAL CHARGE NO: 16GA404217

She was told that I would not be getting a salary increase.

6.  On August 12, 2003, I met with Mr. Halpern about my yearly salary increase. He pointed his finger at me and said that he was not going to give me an increase and he demanded that I get out of his office. The Bookkeeper, Annette Balu(white, female) did receive her annual salary increase. Ms. Balu job description includes some of the functions that I perform.

7. In August 2003, shortly after asking Mr. Halpern for my annual increase and not receiving it, I was suspended from my job for a 14 day period with pay. I was told by Mr. Greenbaum and Ms. Petrucci that I was on paid leave pending the investigation of irregularities in the Payroll Dept. Ms. Balu was not suspended at this time. Diane Harge(black) and Nikisha Davis-Grullon(black) who were not from my department were questioned about my involvement in payroll irregularities which created suspicion within the company for me concerning any possible wrong doings. However, after a thorough investigation, the findings were in my favor as no irregularities were found. I returned to work after the 14 day investigation was over.

8.  On December 7, 2003, Mr. Halpern noticed that I was looking at the balance of my 401K company plan. I was written up and accused of conducting personal business on company time. I believe that the continuous harassment was due my opposing discrimination.

9.  On April 14, 2004, Ed Morales, Controller, suspended me for three days without pay and accused me of stopping my loan payroll deduction as of April 9, 2004 which he labeled as misconduct. I explained to him that I did not stop any deduction. I reminded him that he had only given me the interest amount on April 12, 2004 and that the first deduction would be on April 16, 2004. also on April 12, I requested that the deduction be reduced to twenty dollars per week as opposed to the original agreement of one hundred and twenty-five dollars per week. Mr. Morales said he would discuss the matter with Mr. Halpern and get back to me. . Upon information and belief, I believe this suspension was due to my opposing discrimination.

10.  On April 16, 2004, I addressed my complaint to Ms. Petrucci, concerning my three days of lost pay for being falsely accused. The investigation concerning the misconduct was buried and turned over to Mr. Morales. Since this incident, I alone at the company have not been receiving any company generated paychecks from ADP. I have been paid on a manual bases without computer year to date information. I believe this harassment is due to my opposing discriminatory practices at work.

Complaint: Title VII/ADEA (INT.10) (Supplemental)
/det
05/18/04

114

SDHR NO: 2-E-ORS-04-3508039-A          FEDERAL CHARGE NO: 16GA404217

11.   Based on the foregoing, I hereby charge the above-named respondent with unlawful discriminatory practice related to employment by denying me equal terms, conditions and privileges of employment because I opposed discriminatory practices and because of my race, color and sex in violation of Section 296 of the N.Y.S. Human Rights Law.

Complaint: Title VII/ADEA (INT.10) (Supplemental)
/det
05/18/04

SDHR NO: 2-E-ORS-04-3508039-A          FEDERAL CHARGE NO: 16GA404217

" I have not commenced any other civil or criminal action, nor do I have an action pending before any administrative agency under any other law of this state based upon this same unlawful discriminatory practice."

I also charge the above-named respondent(s) with violating Title VII of the Civil Rights Act of 1964, as amended (covers race, color, creed, national origin, sex relating to employment) and hereby authorize SDHR to accept this verified complaint on behalf of EEOC subject to the statutory limitations contained in Title VII. In addition, I hereby authorize SDHR to accept this verified complaint as a filing under the Age Discrimination in Employment Act (ADEA) as amended (covers ages 40 years of age or older in employment). SDHR covers ages 18 years of age or older in employment.

_(Signature of Complainant)_

STATE OF NEW YORK          )    §:
COUNTY OF Nassau           )

Arleigh Spencer, being duly sworn, deposes and says: that he/she is the complainant herein; that he/she has read (or had read to him/her) the foregoing complaint and knows the content thereof; that the same is true of his/her own knowledge except as to the matters therein stated on information and belief; and that as to those matters, he/she believes the same to be true.

_(Signature of Complainant)_

Subscribed and sworn to before me
this 18th day of May, 2004

_(Signature of Notary Public)_

**BEATRICE KOBAYASHI**
Notary Public, State of New York
No. 02KO5072858
Qualified In NASSAU County
Commission Expires 1/27/07

Complaint: Title VII/ADEA (INT.10) (2 of 2)
/det

05/18/04

116

**Exhibit B**

**STATE OF NEW YORK: EXECUTIVE DEPARTMENT**
**STATE DIVISION OF HUMAN RIGHTS**
-----------------------------------------------------------------------X
ARLEIGH SPENCER,

               Complainant,                                Supplemental
                                                        Complaint
            -against-

International Shoppes, Inc.,                      SDHR NO.:
                                         2-E-ORS-04-3508039-A
               Respondent,                  Federal Charge No.:
                                       16GA404217

-----------------------------------------------------------------------X

I, Arleigh Spencer, 58 years old, residing at 48 Carolyn Avenue, Valley Stream, NY 11580, Tel. No.

(516) 285-4016, charge the above-named Respondent whose address is 540 Rockaway Avenue,

Valley Stream, NY 11581, Tel No. (516) 872-5797, with an unlawful discriminatory practice relating

to Employment in violation of Article 15 of the Executive Law of the State of New York (Human

Rights Law) §290 et seq because of Opposing Discrimination, Race and Color, Sex. I also charge

the above-named Respondent with an unlawful discriminatory practice relating to Employment in

violation of Title VII of the Civil Rights Act of 1964 as amended 42 U.S.C. §2000e et seq because

of discrimination based on race and color, and with an unlawful discriminatory practice relating to

Employment in violation of the Age Discrimination in Employment Act of 1967, 29 U.S. §§621 et

seq. Finally, I charge Respondent with an unlawful discriminatory practice relating to Employment

in violation of both Title VII of the Civil Rights Act of 1964 as amended 42 U.S.C. §2000e-(3)(a)

et seq and Article 15 of the Executive Law of the State of New York (Human Rights Law) §290 et

seq because of retaliation for filing the original Human Rights Complaint dated May 18, 2004 with

the State Division of Human Rights, which is annexed hereto as Exhibit "A."

1. This will supplement my earlier Complaint filed on or about May 18, 2004, annexed hereto as "Exhibit A."

2. On or about May 28, 2004 I was falsely accused of committing a "crime" because I did not distribute payroll checks early. Such checks were dated May 28, 2004, and the company said I should distribute them on May 27, 2004.

3. On or about June 1, 2004, a mere two weeks after I filed my Human Rights Complaint, the false "criminal" accusations were repeated and I was terminated from my position at International Shoppes, Inc. ("Respondent" or "International").

4. Respondent took this action because I filed a complaint with the New York State Division of Human Rights to oppose their unlawful actions.

5. Based on the foregoing The Supplemental Complaint herein sets forth the following charges: an unlawful discriminatory practice relating to Employment in violation of Article 15 of the Executive Law of the State of New York (Human Rights Law) §290 et seq because of Opposing Discrimination, Race and Color, Sex; an unlawful discriminatory practice relating to Employment in violation of Title VII of the Civil Rights Act of 1964 as amended 42 U.S.C. §2000e et seq because of discrimination based on race and color; an unlawful discriminatory practice relating to Employment in violation of the Age Discrimination in Employment Act of 1967, 29 U.S. §§621 et seq., and with an unlawful discriminatory practice relating to Employment in violation of both Title VII of the Civil Rights Act of 1964 as amended 42 U.S.C. §2000e-(3)(a) et seq and Article 15 of the Executive Law of the State of New York (Human Rights Law) §290 et seq because of retaliation for filing the original Human Rights Complaint, dated May 18, 2003, with the State Division of Human Rights.

2

6.    I have not commenced any other civil or criminal action, nor do I have an action pending before any administrative agency under any other law of this state based upon this same unlawful discriminatory actions.

7.    I reserve my right to amend and/or supplement this Supplemental Complaint.

Dated: July 22, 2004
      Rockville Center, New York

_____
ARLEIGH SPENCER
Complainant

Sworn to before me this 22nd
day of July, 2004

_____
Notary Public

**Michelle Renée Katz**
**Notary Public, State of New York**
**No. 02KA6099031**
**Qualified in New York County**
**Commission expires September 22, 2007**

3

120

**Exhibit C**

# PAYROLL COORDINATOR

## JOB DESCRIPTION AND RESPONSIBILITES

- In charge of processing weekly payrolls and filing of related payroll taxes and reports
- Calculates timecards and timesheets for all company payrolls
- Records attendance for employees
- Inputs all computed hours and payroll data to ADP for processing of checks and reports. Distributes checks.
- Maintains payroll journals for company indicating weekly, bi-weekly and monthly costs by department.
- Files and reconciles yearend payroll taxes including W2's for all companies
- Monthly downloads 401K, extract reports from ADP, and imports information into Excel spreadsheet. Reviews data and makes modifications to information to prepare for Plan Manager (our 401k Program) input.
- Runs reports from Plan Manager for review and use for the purpose of remitting payments to our 401k Plan.
- Prepares monthly bank reconciliation's for payroll accounts, Union reports and issues payments for filing to Union Local 1102
- Quarterly calculates disability data by employee-information for the purpose of paying disability insurance and prepares billing for the reimbursement of Beauty Advisors expenses
- Files State unemployment claims, disability and workers compensation claims
- Assists with insurance and 401k enrollments and various payroll matter
- Resolving payroll issues, providing information to the staff
- Works closely with HR and managers, processes new hires, status changes and terminations
- Performs other duties as determined by management but not limited to the above stated responsibilities

122



*Telephone*
*(718) 949-1500*

*Fax*
*(718) 949-1696*

# *International Shoppes Inc.*

DUTY AND TAX FREE GIFTS

*154-09 146th Avenue • Jamaica, New York 11434*

October 10th,2000

*To Whom It May Concern:*

*Since joining the company of International Shoppes inc., Arleigh Spencer has displayed his skills as an experience Payroll Co-coordinator and he performs with excellence. Mr. Spencer's knowledge in Payroll has allowed us to allocate more accounting duties to him and he is always on schedule with his workload.*

*Mr. Spencer joined the company on September 27th, 1999 and started at a salary of $32,500. 00. Mr. Spencer's current salary is now $38,000.00. He is loyal and very productive. He cooperates with all staff members and follows instructions at all times.*

*If you have any questions, please do not hesitate to call me between the Hours of 9-5 at (718)) 949-1500*

*Yours truly,*

*Stephen Greenbaum*
*C E/O*

123

## Payroll Advances

You took several unauthorized salary advances. Presently, you owe the Company $5,100.86 from amounts that you advanced yourself, but have not paid back. These are incorporated into the corporate loan you took out with the Company.

In the future, only Stephen Greenbaum and Michael Halpern are authorized to approve salary advances. All future salary advances for any employee must be approved in writing by either Mr. Greenbaum and Mr. Halpern.

## Garnishments

The Company has reviewed the payroll records to see if appropriate payments have been paid during each payroll period to your garnishees. The review reveals that you did not make the proper garnishments from all paychecks.

It is not appropriate to unilaterally choose not to honor what is in effect an order having the force of law. No one at the Company has authority to refuse to honor a garnishment. In the future, you must honor any garnishment placed on any employee's paycheck, including your own. Garnishments must come out of each paycheck that an employee receives.

## Conclusion

As Payroll Coordinator, you are in a position of trust at this Company. You have breached the trust the Company places in you. Therefore, in the future your paycheck will be processed by Annette Balu. In addition, the payroll will be regularly monitored for any irregularities. At random intervals, the payroll may be audited by our outside accounting firm.

If the Company discovers any additional irregularities or if it learns that you have repeated any of these infractions in the future, it will take appropriate disciplinary action, up to and including termination.

You are expected to abide by the following Company policies:

- Take withholding taxes out of each paycheck (both regular payroll and pre-paid checks) in accordance with W-4 forms on file. All wages and bonuses of any kind are subject to withholding and we will not tolerate any deviation from our policy on withholding.

- If manual (prepaid) checks are issued, take appropriate withholding out of each and every manual check.

- Take withholding, at the bonus-withholding rule, out of all bonus checks.

- Honor all garnishments and ensure that garnishment payments are made with respect to each paycheck.

938824v2

124

**Exhibit D**

**Affidavit Of
Nikisha Davis-Grullon**

To Whom It May Concern:

I Nikisha Davis-Grullon, was a former employee of International Shoppes Inc, and this statement is true to the best of my knowledge.

1. International Shoppes hired me sometime in April 2003. I was introduced to the office staff including Arleigh Spencer.
2. My boss Joan Halpern introduced Mr. Spencer as the person in charged of payroll and the person who will advise you of your entitlements to benefits and the issuing of your weekly paycheck and when the week ends.
3. On August of 26 of 2003, it was rumored throughout the office that Mr. Spencer may have done something wrong and that he was suspended.
4. Shortly after, I was summoned to Stephen Greenbaum's office and in the presence of Mr. Halpern, I was stunned when questioned as to whether Mr. Spencer had discussed and payroll information with me. I felt strange because Mr. Spencer never mentioned or discussed payroll issues with me. Another employee Diane Harge was also questioned.
5. At no time during my employment did Mr. Spencer make me feel uncomfortable. In fact he made me very comfortable and was always giving me good advice. Other employees felt the same way. The majority of the office staff was unhappy with having only 5 days of sick/personal days. It was a lunchtime topic and it is unfair to single Arleigh out as the only employee that was unhappy. The office gossip was that Arleigh was never afraid to express his feelings of injustice because everyone was afraid of Michael Halpern except Arleigh.
6. After Mr. Spencer was reinstated, it was obvious that Management had ostracized him and we all felt sorry for him. Another employee told me that some of the employees are blaming him for having taxes taken from the Christmas bonuses because taxes were never taken out before and it was always the practice of the company even before he was hired. It was my understanding that management was being unfair to him.
7. I witnessed some of the hostility and heard of the ill treatment that he was having. In his office he was faced with every day foul language from another co-worker Annette Balu.
8. Finally, Arleigh made every one feel welcome to ask for their paychecks on Thursday, which is the day before payday. If Arleigh were not at work on any given Thursday, Annette Balu would not give out the paychecks until late Thursday or on the payday that is Friday. There was never a policy that paychecks were to be given out before the pay period. Arleigh was nice enough to accommodate any one who wanted their paycheck the day before to ask for it and this was to all employees. Although some of us cashed our paychecks on

125

that day, I was informed that Annette Balu was angry and that if Michael Halpern found out that paychecks are cashed that he will be very upset. This is why Annette gave out the paychecks after 3:pm to insure that no one could cash their paychecks on Thursdays. It was my understanding that Arleigh was singled and that he was the only employee that had to wait until Friday to get his paycheck.

9.   If you need further information please do not hesitate to call me at (917) 324 5559

Nikisha Davis-Grullon

Sworn to before me this 3rd       day of July 2004

Notary public

Jean F. Gaston
Qualified in Nassau County
Notary Public State of New York
No. 01GA6015481
Commission Expires Nov. 02, 2006

126

STATE OF NEW YORK: EXECUTIVE DEPARTMENT
STATE DIVISION OF HUMAN RIGHTS
------------------------------------------------------------------X

ARLEIGH SPENCER,

                  Complainant,

                  -against-

International Shoppes, Inc.,

                  Respondent,

------------------------------------------------------------------X

Verified Reply To
Respondent's Answer
To Complaint

SDHR NO.:
2-E-ORS-04-3508039-A
Federal Charge No.:
16GA404217

State of New York   )
                   ) ss.:
County of Nassau   )

     Mr. Arleigh Spencer, being duly sworn deposes and says: that he is the Complainant herein, that he has read the foregoing reply and knows the contents thereof; that the same is true of his own knowledge except as to the matter therein stated on information and belief; and that as to those matters, he believes them to be true.

                                         _____
                                         Arleigh Spencer

Sworn to before me this 22nd
day of July, 2004.

_____
Notary Public

Michelle Renée Katz
Notary Public, State of New York
No. 02KA6099031
Qualified in New York County
Commission expires September 22, 2007

8

# EXHIBIT L

Int'l Shoppes          28/2004  3:39   PAGE 2/2   F  ntFax

NEW YORK STATE DEPT. OF LABOR                          Administrative Law Judge
UNEMPLOYMENT INSURANCE DIVISION                        Case Number 004-19831
PO BOX 15130
ALBANY             NY 12212

                                        INTERNATIONAL SHOPPES INC
                                        540 ROCKAWAY AVE
                                        VALLEY STREAM    NY   11581-1918


            EMPLOYER'S NOTICE OF RECEIPT OF REQUEST FOR HEARING OR APPEAL

Re: Claim for Unemployment Insurance of ARLEIGH        SPENCER
SSA# 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

              PLEASE REFER TO ITEM CHECKED BELOW.

☐      Receipt is acknowledged of your request for a hearing.  You will be duly notified of
       the time and place.  Please be prepared to present at the hearing the facts which
       you believe will prove that the local office determination should be changed.
       Please refer to the Administrative Law Judge Case Number shown above in all
       correspondence regarding this hearing.

☒      The above claimant has requested a hearing regarding a local office determination
       that involved the claimant's employment with you. You will be duly notified of the
       time and place of the hearing and the issues to be decided.  Please be prepared to
       present at the hearing the facts you believe will support your position concerning the
       claimant's eligibility. Please refer to the Administrative Law Judge Case Number
       shown above in correspondence regarding this hearing.

☐      Your request for an appeal from the Administrative Law Judge's decision has been
       received and has been forwarded to the Unemployment Insurance Appeal Board. All further
       notices in connection with this appeal will be sent to you by the Appeal Board and all
       further communications regarding this appeal should be addressed by you to the
       Unemployment Insurance Appeal Board, Fourth Floor, One Main Street, Brooklyn, N.Y.
       11201.


Note: If you have an employer representative and their name does not appear on this form,
      please notify the local insurance office.


LO 424.1X ( 5-88)

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

129

# EXHIBIT M



STATE OF NEW YORK
NEMPLOYMENT INSURANCE APPEAL /ARD
ADMINISTRATIVE LAW JUDGE SECTION
PO BOX 697 MAIL STOP 6F
NEW YORK NY 10014-0697
(212) 352-6982

**ROBERT A. LORENZO**
CHIEF ADMINISTRATIVE LAW JUDGE

GEORGE T. DOLAN, JR.
PRINCIPAL ADMINISTRATIVE LAW JUDGE

ALTERIO COLETTI
HOWARD MEISELES
MARGARET O'BRIEN
LAURANCE I. PAVER
LEONARD R. SHAPIRO
PAULA S. YORKE
SENIOR ADMINISTRATIVE LAW JUDGES

*DECISION AND NOTICE OF DECISION*

A.L.J. Case No. 004-19831

IN THE MATTER OF

Mailed and Filed:    SEP 2 4 2004

ARLEIGH  SPENCER
48 CAROLYN AVE.
VALLEY STREAM, NY 11580

INTERNATIONAL SHOPPES INC.
540 ROCKAWAY AVE.
VALLEY STREAM, NY 11581-1918

GREGORY LISI - LAW OFFICE
ATTN.: ELLEN GROARKE
55 FRONT STREET - SUITE #7
ROCKVILLE CENTER NY 11570

HERTEN BURSTEIN SHERIDAN
ATTN.: STEVEN B HARZ, ESQ.
25 MAIN STREET
HACKENSACK NJ 07601-7032

Department of Labor Office: 831

Hearing Requested: July 15, 2004

PLEASE TAKE NOTICE that this decision has been duly mailed on the date listed above. If you appeared at the hearing and are not satisfied with this decision, you may appeal within TWENTY DAYS from the date this decision was mailed. Any party who failed to appear at the hearing has the right to apply to reopen the case. For the application to be granted, the party must apply within a reasonable time and must establish good cause for its failure to appear. READ IMPORTANT INFORMATION ON REVERSE SIDE.

POR FAVOR TOME NOTA que esta decisión ha sido debidamente enviada por correo en la fecha que aparece arriba. Si usted asistió a la audiencia y no está satisfecho con la decisión, usted puede apelar dentro de los VEINTE DIAS a partir de la fecha en que esta decisión fué enviada por correo. Cualquiera de las partes que falle en comparecer a la audiencia, tiene derecho de aplicar para que reabran su caso. Para que la apelación sea aceptada, la parte interesada debe aplicar dentro de un período de tiempo razonable y debe establecer buena causa por no haber comparecido a la audiencia. LEA INFORMACIÓN IMPORTANTE AL REVERSO.

ISSUES:    Loss of employment through misconduct.

The Department of Labor issued the initial determination disqualifying the claimant from receiving benefits effective May 31, 2004, on the basis that the claimant lost employment through misconduct in connection with that employment; and holding that the wages paid to the claimant by International Shoppes Inc. prior to May 31, 2004 cannot be used to establish a future claim for benefits. The claimant requested a hearing.

A hearing was held at which testimony was taken. There were appearances by the claimant and on behalf of the employer.

FINDINGS OF FACT: The claimant was employed from September 27, 1999 to June 1, 2004 as a payroll coordinator for a company that runs duty free shops. He was a full time employee, and was paid at a rate of $841.16 per week.

On September 17, 2002, the claimant received a Disciplinary Notice for failing to inform his supervisors of payroll irregularities that he had discovered at an earlier point in time. The claimant was informed that his actions jeopardized his position within the company.

In September 2003, the claimant was again found to be engaging in payroll irregularities, particularly with respect to his own paycheck. The claimant was not withholding the proper amount of income taxes from his paycheck, and was not making the proper payments on loans that he had received from the employer. The claimant was warned about the ramifications of his behavior, and was simultaneously informed that any further similar infractions would result in further disciplinary action, up to and including the termination of his employment.

AB 665-0 (3/03)

162

A.L.J. Case No. 004-19831                ARLEIGH SPENCER                                        Page 2

On April 13, 2004, the claimant was suspended for three days for improperly stopping the withdrawal of moneys from his paycheck in repayment of the loans that the employer had extended to him. The company provided the claimant with a last chance opportunity save his employment and return to work. The claimant was advised that any further violations of the policies and directives would be grounds for his immediate discharge.

On May 26, 2004, the claimant's supervisor directed the claimant to give the checks to another employee by noon on May 27, 2004, for distribution to other employees. By 2:30 P.M. on May 27, 2004, the claimant had still not turned over the checks. When asked why he had not followed his supervisor's directive, the claimant informed the supervisor that since he had not received his own paycheck the previous day, he was not processing or relinquishing the checks for the other employees. The claimant was discharged on June 1, 2004.

The claimant filed an original claim for benefits effective May 31, 2004. The claimant received $1113.75 in benefits.

OPINION: Pursuant to Labor Law §593(3), a claimant is disqualified from receiving benefits after having lost employment through misconduct in connection with that employment. Pursuant to Labor Law § 527, the wages paid in such employment cannot be used to establish a future claim for benefits.

The credible evidence establishes that the claimant was discharged for failing to follow a directive issued by his supervisor. The claimant was aware that he was in the midst of a last chance opportunity, and that any behavior on his part that was in violation of the employer's rules and procedures would be grounds for immediate dismissal. He was also well aware of his responsibility and the time frame within which he was to turn over the checks that were to be distributed to other employees. His refusal to do so was in violation of the supervisor's directive. The claimant's behavior exceeds more that poor judgment, and clearly rises to the level of misconduct. An employee's knowing violation of an employer's established policy has been held to constitute disqualifying misconduct (*Matter of Rothman*, 242 AD2d 818, *affg* A.B. Case No. 464444 A.) Accordingly, I conclude that the claimant's actions constitute misconduct in connection with employment and, therefore, the claimant is disqualified from receiving benefits.

DECISION: The initial determination disqualifying the claimant from receiving benefits effective May 31, 2004, on the basis that the claimant lost employment through misconduct in connection with that employment; holding that the wages paid to the claimant by International Shoppes Inc. prior to May 31, 2004 cannot be used to establish a future claim for benefits, is modified to be effective June 2, 2004, and, as so modified, is sustained.

The claimant is disqualified from receiving benefits, effective June 2, 2004, until the claimant has subsequently worked in employment and earned remuneration at least equal to five times the claimant's weekly benefit rate. Employment and earnings from non-covered, excluded or self-employment will not count.

/s/ JOYCE P McALISTER

**Administrative Law Judge**

163

# EXHIBIT N

Not Reported in F.Supp.2d, 2007 WL 1703180 (E.D.N.Y.), 35 NDLR P 15

Motions, Pleadings and Filings

United States District Court,
E.D. New York.
Deborah D. **CHESHIRE**, Plaintiff,
v.
Henry M. **PAULSON**, Jr.,[FN1] Secretary of the Treasury, Internal Revenue Service, Defendant.

> FN1. Pursuant to Federal Rule of Civil Procedure 25(d)(1), Henry M. **Paulson**, Jr. is substituted for his predecessor, John W. Snow, as Secretary of the Treasury.

No. 04-CV-3884 (FB)(LB).
June 12, 2007.

Deborah D. Cheshire, Pro Se, Brooklyn, NY, for the Plaintiff.

Roslynn R. Mauskopf, Esq. United States Attorney by Catherine M. Mirabile, Esq., Brooklyn, NY, for the Defendant.

### MEMORANDUM AND ORDER

BLOCK, Senior District Judge.

*\*1 Pro se* plaintiff Deborah D. Cheshire ("Cheshire") sues her former employer, the Secretary of the Treasury, as head of the Internal Revenue Service ("the IRS"), alleging discrimination and retaliation in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* ("Rehabilitation Act").[FN2] Specifically, Cheshire alleges discrimination on the basis of her disability (rheumatoid arthritis) when, between August 2000 and April 2001, the IRS issued her a "leave restriction letter," charged her as Absent Without Leave ("AWOL") when she failed to adhere to the terms of that letter, and denied her requests for an alternate work schedule; she also alleges retaliation for having filed an Equal Employment Opportunity ("EEO") complaint when, after May 2001, she was not permitted to use leave under the Family Medical Leave Act ("FMLA"), charged AWOL, placed on extended leave restriction, and threatened with suspension and removal.

> FN2. Cheshire's *pro se* complaint alleges violations of the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"). Since the ADA does not apply to the government, its agencies or employees, *see* 42 U.S.C. § 12111(5)(B), the Court liberally construes her complaint as alleging violations of the Rehabilitation Act.

Having provided the requisite notice, *see* E.D.N.Y. R. 56.2, defendant moves for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons stated below, defendant's motion is granted

### I.

Cheshire has not responded to defendant's motion. The Court must nevertheless analyze the entire record and "assess whether the moving party has fulfilled its burden" of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004). The following undisputed facts are taken from defendant's Rule 56.1 statement and documents filed in support of its motion:

Between 1987 and 2002, Cheshire worked for the IRS in New York as the fulltime secretary for the Joint Committee Review Group ("the Group"). In that role, Cheshire performed a wide range of administrative duties, including routing mail, preparing correspondence and reports, maintaining files, and tracking employee time and attendance; she concedes that, except for typing, her job duties could only be performed at the IRS office. *See* Declaration of Catherine M. Mirabile ("Mirabile Decl."), Ex. B (Cheshire Dep.) at 87 ("Filing I wouldn't be able to do at

home. My typing-I guess I could have....").

In the late 1980s, Cheshire was diagnosed with rheumatoid arthritis. Her symptoms, which included flare-ups, swelling, spasms and daily pain that affected her ability to walk, sit and carry heavy objects, were manageable until 2000, and then increased between 2000 and 2001.

On August 23, 2000, Cheshire's supervisor, Chritopher McAlinden ("McAliden"), counseled her regarding her leave usage, particularly her use of unscheduled leave. During that session, McAlinden informed her of the IRS's expectations regarding attendance, the leave approval process and procedures for notifying management of expected absences. Cheshire's leave usage did not change. As a result, in October 2000, McAlinden told Cheshire to begin submitting documentation supporting each absence.

**\*2** On January 31, 2001, McAlinden counseled Cheshire a second time regarding her excessive absences. In a written counseling memorandum provided to Cheshire during the session, McAlinden noted that "[a] significant amount of [her] leave usage [from June to December 2000] ha[d] been unscheduled leave"; he also advised her that he would be monitoring her attendance for the following 30 days, and warned that he would issue a "leave restriction letter" if her attendance did not improve. Mirabile Decl., Ex. J (Counseling Mem.) at 3.

On that same date, Cheshire informed McAlinden that she wanted to request leave under the Family and Medical Leave Act ("FMLA"); she also requested an alternative work schedule. *See id.,* Ex. EE (Contact Memo.). With respect to the FMLA request, Cheshire subsequently applied for coverage based on her condition of rheumatoid arthritis and was notified of her approval on March 29, 2001-allowing her to take up to twelve weeks of unpaid leave per year if supported by adequate medical documentation. *See id.,* Exs. FF (FMLA Application), HH (Approval Letter). With respect to the alternative work schedule, she specifically requested a "5/4-9 schedule"-consisting of eight nine-hour work days, one eight-hour work day, and one non-work day each biweekly pay period. *See id.,* Ex. EE (Contact Memo.). After receiving a doctor's note permitting Cheshire to work more than eight hours per day, the IRS approved her alternative work schedule on a three-month trial basis; the IRS subsequently rescinded its approval, concluding that Cheshire's ongoing unauthorized absences demonstrated an inability to work the 5/4-9 schedule. *See id.,* Ex. LL (McAlinden Aff.) at 97-99, 105-06.

In February 2001, Cheshire requested an ergonomic chair to help her with her arthritic condition; the IRS provided that accommodation. *See id.,* Exs. B (Cheshire Dep.) at 141-42, LL (McAlinden Aff.) at 97-98. Around the same time, she also requested permission to work flex hours, defined by the IRS as hours working from home; that request was denied. *See id.,* Ex. B (Cheshire Dep.) at 86-87.

On March 29, 2001, the IRS issued Cheshire a leave restriction letter for continuing to take leave that was either not approved beforehand or unsupported by adequate medical documentation. Under the terms of the letter, the restriction would last for six months; during that time, she was required (1) to submit acceptable medical documentation for all leave taken for medical reasons, and (2) to speak personally to her manager or second-level manager to request leave. The letter informed Cheshire that her failure to meet these requirements would result in AWOL charges. *See id.,* Ex. K (Leave Restriction Letter).

On April 14, 2001, Cheshire filed a formal EEO complaint challenging the leave restriction letter, specific instances in which the IRS charged her absences as AWOL rather than Leave Without Pay ("LWOP"), and the denial of her request for a 5/4-9 schedule. *See id.,* Ex. JJ (EEO Complaint).

**\*3** From March 30 to July 13, 2001, Cheshire was charged AWOL for 310 hours. On July 26, 2001, the IRS proposed to suspend her for a period of three days based on her AWOL charges and failure to abide by the terms of the leave restriction letter. *See id.,* Ex. X (Proposed Suspension).

From July 14 to September 6, 2001, Cheshire was charged with an additional 121.5 hours AWOL. On October 26, 2001, the terms and conditions of the leave restriction letter were extended an additional six months. *See id.,* Ex. Y (Leave Restriction Extension). On November 29, 2001, the IRS rescinded its proposed three-day suspension and issued a proposal-to-terminate letter based on her continued failure to follow the terms of the leave restriction letter. *See id.,* Ex. Z (Proposed Termination).

In January 2001, Cheshire filed a second EEO complaint challenging the actions taken by the IRS subsequent to the first complaint. The EEOC consolidated the two complaints and, on June 19, 2004, "conclude[d] that [Cheshire] ha[d] failed to meet her burden of proving disability and reprisal discrimination" and advised her of her right to sue. *Id.,* Ex. A (EEOC Decision) at 5.

Cheshire was never terminated. She applied for disability retirement in March 2002 and did not work after that

date. She officially retired from the IRS on disability in February 2003.

## II.

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her [ ] disability, be ... subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The Act further states that "[t]he standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under [the sections of the ADA relating to employment]." Id. § 794(d). Interpreting this language, the Second Circuit has held that an employer violates the Rehabilitation Act not only through intentional discrimination, but also when it fails to make a reasonable accommodation for an otherwise qualified employee with a disability. See Jackan v. New York State Dept. of Labor, 205 F.3d 562, 566 (2d Cir.2000) (citing 42 U.S.C. § 12112(b)(5)(A) and 29 U.S.C. § 794 (d)). The Second Circuit has also interpreted the Act's prohibition on employment discrimination as authorizing retaliation claims. See, e.g., Weixel v. Board of Educ ., 287 F.3d 138, 148 (2d Cir.2002) (recognizing retaliation claim under § 794).

### A. Intentional Discrimination

A claim of intentional disability discrimination under the Rehabilitation Act is analyzed under the familiar burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1972). See Regional Econ. Cmty. Program, Inc. v. City of Middletown, 294 F.3d 35, 48-49, 54 (2d Cir.2002). Under that framework, the plaintiff must first establish a prima facie case. If she does, the employer must offer a legitimate non-discriminatory reason for the adverse action; the plaintiff must then produce evidence that the proffered reason is a pretext. See id. at 49.

### 1. Prima Facie Case

*4 To establish a prima facie case under the ADA, a plaintiff must show that "(1) [her] employer is subject to the [statute]; (2)[she] was disabled within the meaning of the [statute]; (3)[she] was otherwise qualified to perform the essential functions of [her] job, with or without reasonable accommodation; and (4)[she] suffered adverse employment action because of [her] disability." Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir.2006). The standard under the Rehabilitation Act is the same except for the fourth element: Unlike the ADA, which "makes it unlawful for an employer to discriminate against a qualified individual ' because of the disability of such individual,' " the Rehabilitation Act "prohibits entities from receiving federal funding from discriminating ' solely by reason of [an individual's] disability .' " Parker v. Columbia Pictures Indus., 204 F.3d 326, 337 (2d Cir.2000) (internal citations omitted, emphasis added).

With respect to the first element, the IRS does not dispute that it is subject to the Rehabilitation Act. As for the second element, the Court need not decide whether Cheshire was disabled due to her rheumatoid arthritis; even if she were, the record does not contain sufficient evidence to support the third and fourth elements.

With respect to the third element, since Cheshire concedes that the majority of her job functions could only be completed at the office, it is beyond dispute that regular attendance was an essential function of her job. See Ramirez v. New York City Bd. of Educ., 481 F.Supp.2d 209, 221 (E.D.N.Y.2007) ("To be a qualified individual, in addition to possessing the skills necessary to perform the job in question, an employee must be willing and able to demonstrate those skills by coming to work on a regular basis." (internal quotation marks and citation omitted)). Her frequent unscheduled absences demonstrate that she was unable to perform that function without accommodation.

Cheshire's proposed accommodations would not have solved the problem. Although Cheshire was approved for FMLA coverage in March 2001, her own failure to provide adequate medical documentation supporting her absences after that date rendered the accommodation ineffective. As for her rejected proposal to work flex hours from home, Cheshire's concession that most of her job functions required her to be at the office is again dispositive: The Second Circuit has held that "[a] reasonable accommodation can never involve the elimination of an essential function of a job." Shannon v. New York City Transit Auth., 332 F.3d 95, 100 (2d Cir.2003). Finally, with respect to Cheshire's proposed alternative work schedule, which the IRS also rejected, the record does not show that this accommodation would have permitted her to satisfy the requirements of her job. See Borkowski v. Valley Cent. School Dist., 63 F.3d 131, 138 (2d Cir.1995) ("[T]he plaintiff bears the burden of proving either that she can meet the requirements of the job without assistance, or that an accommodation exists that permits her to perform the job's essential functions."). On the contrary, Cheshire's recorded absences in 2001-most notably, those charged as AWOL-far exceeded the hours she would have obtained under the 5/4-9 schedule.

*5 With respect to the fourth element, the Second Circuit has held that "[a] plaintiff sustains an adverse

employment action if [ ] she endures a 'materially adverse change' in the terms and conditions of employment"; such a change "might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000) (internal quotation marks and citations omitted).

The AWOL charges at issue here cannot be considered adverse employment actions. Cheshire's sole contention is that the time charged as AWOL should have been charged as LWOP. But since both types of leave are unpaid, such a reclassification would not have altered Cheshire's pay. And while excessive AWOL seems to have been the basis for later disciplinary action (i.e., her proposed suspension and, later, termination), those actions never took effect.

In contrast, the leave restriction letter could arguably qualify as adverse employment action since it materially affected Cheshire's ability to access FMLA benefits by imposing additional requirements upon her (e.g., requiring personal contact with her manager or second-level manager). There is no evidence in the record, however, to support Cheshire's claim that the IRS issued this letter solely because of her disability; on the contrary, by the time the letter was issued, McAlinden had twice counseled her about her excessive leave usage, and warned her that a letter would issue if her attendance did not improve.

### 2. Legitimate Non-Pretextual Reasons

Even assuming that the record supported Cheshire's *prima facie* case of discrimination, the IRS has offered a legitimate reason for taking adverse action against her: namely, her excessive unauthorized absences, even after the IRS informed her of its expectations regarding attendance and warned of the consequences of her continued failure to meet those expectations. The record does not contain any evidence that this reason was pretextual.

### B. Retaliation

Like claims of disability discrimination, a claim of retaliation under the Rehabilitation Act is analyzed under *McDonnell Douglas's* burden-shifting framework. *See City of Middletown,* 294 F.3d at 48-49, 54 (applying *McDonnell Douglas* to discrimination and retaliation claims under Rehabilitation Act). The elements of a *prima facie* claim for retaliation under the Rehabilitation Act, as under other anti-discrimination statutes, are "(i) [ ] plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Weixel,* 287 F.3d at 148 (internal quotation marks and citation omitted).

**\*6** Defendant does not dispute that Cheshire engaged in protected activity when she filed an EEO complaint in April 2001 or that the IRS was aware of this complaint.

With respect to the third element, the October 2001 extension of leave restriction would arguably qualify as an adverse employment action since it had the same effect on Cheshire's ability to access FMLA leave as the prior letter. In contrast, specific instances in which the IRS charged her absences as AWOL rather than FMLA had no direct effect her overall ability to access benefits, and therefore did not constitute "materially adverse change[s] in the terms and conditions of [her] employment." *Galabya,* 202 F.3d at 640. Nor did the IRS's proposed suspension and termination constitute adverse employment actions, since both were ultimately rescinded. *See, e.g., Hill v. Children's Vill.,* 196 F.Supp.2d 389, 397 (S.D.N.Y.2002) (holding that warning letter alone "is insufficient to create a tangible employment detriment"). Although the Second Circuit has recently held that an action may also be "adverse" if it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," *Kessler v. Westchester County Dep't of Soc. Servs.,* 461 F.3d 199, 207 (2d Cir.2006) (internal quotation marks and citations omitted), there is no such evidence here; on the contrary, Cheshire filed a second EEO complaint in January 2002.

Finally, with respect to the fourth element, Cheshire would have to establish a causal connection between her EEO complaint and the IRS's adverse action either " *indirectly* by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or *directly* through evidence of retaliatory animus directed against a plaintiff by the defendant." *DeCintio v. Westchester County Med. Ctr.,* 821 F.2d 111, 115 (2d Cir.1987) (emphasis in original). The record does not contain any evidence that the IRS treated other employees differently for their absences, or that Cheshire's managers displayed any retaliatory animus towards her. Nor is Cheshire's *prima facie* case supported by proximity in time since the IRS imposed a leave restriction upon her *before* she filed the April 2001 complaint and did not change its course of discipline afterwards. *See Slattery v. Swiss Reins. Am. Corp.,* 248 F.3d 87, 95 (2d Cir.2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.").

Even assuming that the record supported a *prima facie* case of retaliation, Cheshire, once again, has not offered any evidence that the IRS's proffered non-retaliatory basis for its actions-her excessive unscheduled absences-were pretextual.

## C. Failure to Accommodate

*\*7* Even where no adverse employment action such as termination or demotion is taken, "[a]n employer violates the ADA and the Rehabilitation Act when it fails to 'mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee,' unless the employer can establish that the accommodations would 'impose an undue hardship.' " *Jackan,* 205 F.3d 562 at 566 (citations omitted). In order for the plaintiff to make out a *prima facie* showing, "[i]t is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." *Borkowski,* 63 F.3d at 138. Since, however, the record does not contain sufficient evidence that the accommodations rejected by the IRS-the alternative work schedule or flex hours-would have permitted her to perform the essential functions of her job, *see supra* Part II.A.1, this burden has not been met. Accordingly, the Court need not determine whether these accommodations would have imposed an undue hardship on the IRS.

## CONCLUSION

Defendant's motion to for summary judgment is granted and plaintiff's complaint is dismissed.

### SO ORDERED.

E.D.N.Y.,2007.
**Cheshire** v. **Paulson**
Not Reported in F.Supp.2d, 2007 WL 1703180 (E.D.N.Y.), 35 NDLR P 15

Motions, Pleadings and Filings (Back to top)

• 1:04cv03884 (Docket) (Sep. 3, 2004)
• 2004 WL 2597843 (Trial Pleading) Complaint (2004)
END OF DOCUMENT

(c) 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.